UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------:

UNITED STATES OF AMERICA,     :

                              : Docket #24-MJ-2422

            Plaintiff,        :

    v.                        :

JUSTIN HEATH SMITH,           : New York, New York

            Defendant.    : June 28, 2024

----------------------------:


TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE ROBYN TARNOFSKY

UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:      UNITED STATES ATTORNEY'S OFFICE
                    SOUTHERN DISTRICT OF NEW YORK
                    BY:  Getzel Berger, AUSA
                    One St. Andrew's Plaza
                    New York, New York 10007

For Defendant:      THE LAW OFFICES OF
                    THOMAS ANDRYKOVITZ
                    BY:  Thomas Andrykovitz, Esq.
                        Michael Baldassare, Esq.
                        Jeffrey Hawriluk, Esq.
                    260 Madison Avenue
                    New York, New York 10016


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

AMM TRANSCRIPTION SERVICE - 631.334.1445

THE DEPUTY CLERK:  Good afternoon.  Judge Robyn Tarnofsky is now presiding.

THE COURT:  Please be seated.

THE DEPUTY CLERK:  Today we have USA v. Justin Heath Smith; 24-MAG-2422.

Counsel, please make your appearance for the record.  Government first.

MR. BERGER:  Good afternoon, Your Honor. Getzel Berger for the government.  I'm joined here by FBI Special Agent Matthew Deragon, and our summer law student intern, Rachel Blatt (phonetic).

MR. BALDASSARE:  Good afternoon, Your Honor.

Michael Baldassare, Jeff Hawriluk and Tom Andrykovitz on behalf of defendant, Justin Smith, who is seated to my right.

THE COURT:  Good afternoon, everyone. Thank you for being here.

Okay.  Mr. Smith, you are here today because you've been charged with certain crimes in a complaint.

Actually, we should just start -- can I have the date and time of the arrest?

MR. BERGER:  Yes.  This morning at 8 a.m.; so June 28th.

THE COURT: Okay. And the time of presentment is 3:40.

So my name is Magistrate Judge Tarnofsky, and you're here because you've been charged with certain crimes in a complaint. The purpose of the proceeding today is to advise you of certain rights that you have, to inform you of the charges against you, to consider -- you have private counsel, so we don't need to consider whether counsel should be appointed, and to decide under what conditions, if any, you should be released pending trial.

I'm going to first explain certain constitutional rights that you have.

You have the right to remain silent. You're not required to make any statements. Even if you've already made statements to the authorities, you don't need to make any more statements. And any statements you make can be used against you.

You have the right to be released either conditionally or unconditionally pending trial, unless I find there are no conditions that would reasonably assure your presence at future court appearances and the safety of the community.

If you're not a U.S. citizen, you have the right to request that a consular official from your

country of origin be notified of your arrest.  In some cases, a treaty or other agreement may require the U.S. government to give that notice whether you request it or not.  And I'm required by law to tell you this, even if you are a U.S. citizen and it doesn't apply to you.

You have the right to be represented by a lawyer during all court proceedings, including this one and during all questioning by the authorities. You have the right to hire your own attorney, but if you can't afford one, I will appoint one here today to represent you.

Okay.  Mr. Smith, I have in front of me the complaint which contains the charges against you. And the complaint charges in Count One, the receipt and distribution of child pornography from at least March 24, 2024 through at least March 28, 2024 in the Southern District of New York and elsewhere, receiving and distributing child pornography, in violation of Title 18 U.S. Code §§ 2252A(a)(2)(B), (b)(1), and 2.

Count Two, possession of child pornography from at least on or around March 24, 2024 through at least April 21, 2024 in the Southern District of New York, in violation of Title 18 U.S. Code §§

2252A(a)(5)(B), (b)(2), and 2.

Counsel, have you received a copy of the complaint?

MR. BALDASSARE: Yes, Judge.

THE COURT: And have you reviewed it with your client?

MR. BALDASSARE: We have, Your Honor.

THE COURT: Okay. Mr. Smith, you have the right to a preliminary hearing. And at the preliminary hearing, the government would have the burden of establishing that there is probable cause to believe that the crime for which you're being charged was committed, and that you are the person who committed that crime. You or your lawyer would be entitled to cross examine any witnesses and introduce evidence.

If you're in custody, you have the right to the preliminary hearing within 14 days. If you're out of custody, you have the right to have the preliminary hearing within 21 days. But a preliminary hearing won't be held if before the date it is supposed to happen, you're indicted by the grand jury, or the government files a document against you called an information.

I'm going to set the preliminary hearing

date at the conclusion of the proceeding.

Okay. So since we have a complaint and not an indictment, we are not doing an arraignment and we'll move straight to the question of bail. And I'd like to ask the government what its position is regarding release pending trial.

MR. BERGER: The government seeks detention, Your Honor.

THE COURT: And is there consent to detention?

MR. BALDASSARE: No, Judge.

THE COURT: Okay. Then on what basis, Mr. Berger, is the government seeking detention?

MR. BERGER: Danger.

THE COURT: Danger.

So you, I'm sure, are aware that you can't seek detention based on danger only. What provision of 18 U.S.C. § 3142(f) provides the authority for holding a detention hearing?

MR. BERGER: So the government moves for a detention hearing under 18 U.S.C. § 3142(f)(1)(e) Because the defendant is charged with felonies that involve minor victims, and under 18 U.S.C. § 3142(e)(3)(E) there is a presumption that no condition or combination of conditions will

reasonably assure the safety of the community. And this presumption applies because the defendant is accused of violating 18 U.S.C. § 2252A(2), which is one of the enumerated statutes in § 3142.

THE COURT: Okay. Thank you.

So, Mr. Smith, in this case, it's called a presumption case. The government has asked that you be detained. The government is entitled to make this request because of the nature of the charges against you. You have been charged with a violation of crimes involving minor children, so I am granting the request for a detention hearing.

I now have to determine whether there is any condition or combination of conditions of release that would protect the safety of the community and reasonably assure your appearance at trial. In making this determination, I have to consider several factors: The nature and circumstances of the charged offense, including whether the crime involves a minor victim, the weight of the evidence against you, your personal history and characteristics, including your character, family ties, financial resources, community ties, past conduct, criminal history, and whether you were on probation or parole at the time

you allegedly committed this crime.  I also have to consider the nature and seriousness of the danger to anyone or to the community that would be posed by your release.

This is a presumption case.  And so because you are accused of one of several specified crimes, there is a presumption that no conditions of release will reasonably ensure the safety of the community; however, the presumption is rebuttable, and the government ultimately bears the burden of establishing by clear and convincing evidence that you're a danger to the community or establishing by a preponderance of the evidence that you are a risk of flight.

I will now hear from counsel, starting with the government.  Please tell me why you believe detention is warranted in this case.

MR. BERGER:  Thank you, Your Honor.

The defendant is accused of having sent, received and possessed hundreds of videos of child pornography.  These videos show young children being raped.  But that's only the beginning.  There's also overwhelming evidence that he's a hands-on predator.

So far, the FBI has been able to access the defendant's messages for only four months, January

through April of 2024, but the messages show that in those four months alone, the defendant had sex with several 15-year-olds, tried to have sex with younger children, including 12- and 14-year-olds, and made plans to meet with a man who would make a 7-year-old child available to the defendant for sex, for rape.

I won't repeat everything we said in our papers, but I'll briefly touch upon both the charged conduct and the uncharged conduct. But the key point that I want to convey is that the defendant's conduct is recent, it's prolific, it involves action, not just talk or videos, and most of it happened from the comfort of his own home.

Starting with the charged conduct, possession and distribution of child pornography. And the reason I'm starting here is because it's important not to lose sight of the seriousness of the charged conduct, even setting aside the even more serious uncharged conduct.

This is not a case where someone sat passively at a computer screen and watched an image or video containing child pornography. The defendant actively sent, solicited, received and stored hundreds of these videos. These videos involve children as young as infants, and these were

violent videos, nightmarish videos.  We included descriptions of two of these videos in our submission, and I won't repeat them, but one of them shows a 10-year-old tied up, beaten and raped, and the other one shows an infant being violently raped. Every time the defendant shared one of these videos, he re-victimized one of these raped children.

And it's also important to focus on the weight of the evidence on the charged conduct. There can be virtually no doubt that the defendant was the user of the "Anon Anon" Telegram account that sent and received these videos.  And, again, I won't repeat everything in our submission, but suffice it to say that when the FBI seized his phone and sent a message to the "Anon Anon" Telegram account, a pop-up notification appeared on his phone.  That's the charged conduct.

But turning to the uncharged conduct, and in our written submission we laid out the legal authority for considering uncharged conduct in this context, our letter had just a preview of some of these messages found on the defendant's phone.  But that preview, which, again, spanned a short snippet of time -- four months -- shows that the defendant is a prolific hands-on offender.

He appears to have had sex with a 15-year-old several times, including a threesome with another adult man that the defendant recorded. He appears to have had sex with at least one other 15-year-old. He asked the third 15-year-old to produce child pornography for him, which the minor did, and sent it to the defendant. He asked a 14-year-old to send him pictures of his 10-year-old sibling. He tried to meet up with a 12-year-old during his travels in Florida, and appears to have exchanged pornography with the 12-year-old. And, most disturbingly, he made concrete plans to have sex with a 7-year-old child, including discussions with the child's father about booking an Airbnb and about the child getting some sort of doll.

He even invited others, including an undercover FBI agent, to join in. Were it not for the FBI executing a search warrant at his house on Sunday, before that was about to happen, he may well have gone through with it. Your Honor, this conduct leads to only one conclusion, that the defendant is a danger to children. He's a danger to children online. He's a danger to children offline. He's a danger to children anywhere.

And I want to address head-on the defense's

argument for home detention. Home detention will not keep the community safe because that's exactly where the defendant committed this conduct. That's where he kept and shared his child pornography. That's where he hosted minors for sex, and that's where he even had the built-in cameras that recorded one of these sessions.

Simply put, he doesn't have to be outside the house to be a danger. And as we said in our submission, because of his high profile, he doesn't have to chase after child pornography or child sex abuse. It can come to him, including, for example, the episode of the father and 7-year-old child. That's why confining him to his house does not lessen the danger in any meaningful sense.

And for the same reason, restrictions on electronic communications will also not protect the community. The defendant is clearly a sophisticated operator. He is very familiar with the tools that can be used to avoid detection. For example, he used platforms like Telegram, which are not amenable to legal process. He used anonymous accounts to hide his identity. He sent disappearing messages when he was discussing his illegal activities. And, importantly, he deleted his Telegram and Telegram

account history when he found out that the FBI was
investigating him.

And on the topic of electronic activity, I
think everyone in this room will agree, as we said
in our submission, that Pretrial Services does a
heroic job of monitoring online activity, but
they're not super human, and neither is the FBI.  At
the end of the day, nothing can prevent the
defendant from getting a new phone, setting up
another anonymous account and picking up right where
you left off, which is sharing child pornography and
preying on children.  Only detention can ensure the
safety of the community.

THE COURT:  Thank you.

Counsel?

MR. BALDASSARE:  Yes, Judge.

Given that my client has no criminal
history and faces being sent to the disgusting,
inhumane conditions at MDC, which we talked about,
I, kind of, have quite a bit to say, particularly
given the government's, I think, wrongly incendiary
filing.

So here's what I would say:  I would say
that the presumption certainly is rebutted in this
case, and, therefore, the government is now held to

the standard for clear and convincing evidence on danger. And by the way, Judge, I really think -- and I think the government would agree -- that today is really about danger. I'm not hearing a lot about risk of flight.

THE COURT: I don't think anybody here is thinking that he's a flight risk.

MR. BALDASSARE: Okay. So I'll move right to that.

So we know from *Mercedes* and the other cases, *Dominguez* and *Cross*, that simply his time in the community, his long-term, ten-year relationship with the proposed third-party custodian who's been vetted -- I don't know what Pretrial thinks of if he's okay. We know that his work, his citizenship, his self-surrender -- we know that almost as a matter of law, based on the cases, that's sufficient to rebut the presumption and put back on the government the burden of clear and convincing evidence for danger, which I think is what we just heard the evidence of.

And here's what I would say, Judge: The government's submission certainly reads like a compelling tale. The allegations are serious, the comments are serious, and aside from the fact that

they're untested, the fact of the matter is, it is a group of facts woven together in a way to be more compelling than it really is.

For example, after they talk about why they believe the "Anon" account is him, what we get thereafter is instead of the text exchanges, instead of "Anon," or whatever the name is, they get Smith, Smith, Smith, Smith, Smith. But I've not seen anything that says it was an account attributable to him. I think that's unfair. I think it's disingenuous.

I'm not saying they're liars. I'm not saying they're unethical, but it's wrong, and they have to meet a high degree of certainty. That's how the Second Circuit has described it. So we have Smith, Smith, Smith, as if we know it's him.

Here's what I would say about him being "Anon" -- and this is something that is critical to every single paragraph. And I'm going to talk about these. I'm not going to run from their submission.

Here's how we know the government thinks he's "Anon": Someone who got popped with a ton of child porn on his phone said so. That's number one.

We don't know who this person is. This isn't someone who in a search warrant they're able

to say, this person's been reliable a million times before. Actually, we know that person is presumptively not reliable because this person got arrested with a phone loaded with child porn and is, within pretty short order, trying to deliver heads.

And how do we know it's short order? Because their submission says that they seized his phone at some point in April, and we know that they're at our client's house on April 21st. That's the one way they know it. And they think that gives a high degree of certainty. I doubt it. They would never charge a case based just on that.

The other way they say is that they sent a message from Telegram and a notification popped up on my client's phone. Well, respectfully, Judge, I would think anybody -- and they said themselves he's got a big Internet presence. He's a famous actor or performer, however we want to call it. I think there are people in that industry -- and, respectfully, I think everybody under the age of 20 -- he's older than that. Notifications explode on people's phones.

So the fact of the matter is, they sent something and something showed up on Telegram, which, by the way, there's no text. It's not the

message they sent. They don't say that. They don't say it shows it's from -- say if it was me, from Mike Baldassare. They say, we sent a message and something came up. Okay. But you're looking to send a guy to a place that we all know is one of the worst places in the country. You're looking to meet a high degree of certainty. I think we have to go or come to this Court with something a little bit more compelling than something that happens all day, every day on everybody's phone, except maybe mine because I think I'm on one social media platform. And we know that Mr. Smith has a humongous social media -- excuse me -- social media presence on a number of platforms.

So let's look at the -- if I can start on page 1, page 1 talks about the fact that they seized someone's phone and that the two users exchanged hundreds of videos. Okay. Well, they described two. I don't see written here any allegation that the person whose phone they have, the cooperator -- did he send them or receive them? It doesn't matter full possession or receipt.

But the fact of the matter is, somebody who is sending it out there -- we don't know if it was solicited. We don't know if this person sent it.

All we know is the artfully drafted, with all due
respect, they exchanged hundreds of videos. They
don't say here that the "Anon" person sent them.
That's number one.

Number two, he says -- and this is where
the individual Target Telegram User-1 -- and by the
way, Judge -- and, again, just to talk about how
this is drafted because it reads like, oh, my God,
if I didn't give this a close read, I shouldn't have
brought anything. With all due respect, they should
have come with a pad and ported him through. But
they don't call him suspect, punitive defendant,
cooperator. This person who they arrested with tons
of child porn is known as Target Telegram User-1, as
if that somehow changes who this person is or what
his motivations are. So that's how -- that's what
they say in the second paragraph there after they've
described these videos.

Okay. So that's, kind of, where the
charged conduct discussion ends. And just like
we're not here about risk of flight, respectfully, I
don't really think we're even here about the charged
conduct. I think this is a very different hearing
if my client was charged with what is unfortunately
an all-too-common charge in federal court. I'm not

saying those charges aren't serious.  Of course they
are.  But the truth is, if we were here just on a --
and I don't mean any disrespect to victims.  If we
were here on a run-of-the-mill child pornography
case, I think this hearing is very different.  And I
think we easily would -- we'd still have a
presumption to rebut, but it would be very
different.

This case is really about all of the things
in the letter that are flimsy when tied to my
client, and they don't really hold up to scrutiny.
And I think, with all due respect, the government
says that the charge -- the conduct is overwhelming
and that it is somehow beyond reproach.

Well, here's what I would say:  Other
relevant conduct, we have the summary paragraph,
right, with the word "apparent."  By the way, this
overwhelming evidence -- my colleague, who I have a
good relationship with -- here's what I heard a lot
today:  "Apparent, apparent, apparent."  And it's
all over their submission, "apparent."  Okay.  A lot
of things are apparent, but that doesn't mean it's
clear and convincing evidence.  Less than beyond a
reasonable doubt, but way more than a preponderance.

So then they go on page 2 to the individual

allegations.  This is the threesome that's recorded that they say -- and I don't challenge this.  I don't challenge their proffer that it was found on his iPhone, but it's an apparent 15-year-old.  I haven't seen it.  It's not an apparent 10-year-old where anybody could watch it and say, okay, that person's 10 years old.  A 15-year-old could easily be a young 18, 19, or 20-year-old person.  They're not experts.  The government's not experts.

I don't see somebody saying, oh, I've looked at this.  In the old days of child pornography cases, you would have experts who could look at femur length or facial recognition or facial.  We don't have any of that.  We have a bunch -- respectfully, we have the government saying, hmm, we think that person looks 15.  But they say that it's corroborated by -- let's see -- by a message "inviting" -- their words -- "inviting" somebody else to the threesome.  But that's not what this says.

This says "Smith," which, to my understanding, is not Smith.  It's "Anon."  But I'll read it as Smith for purposes of today.

"SMITH:  Hey."

Other User.  I don't know who that is.

They don't have any indication on who that second person is.

So it goes:

"SMITH:  Hey.

"OTHER USER:  Sup?

"SMITH:  I have a boy.

"SMITH:  15."

Now, what I don't know is -- I don't have any representation as to why that conversation, which we don't know who it is, they decided that that, A, is an invitation.  Doesn't sound like one to me.  And B, they say that that corroborates the video.  And that's why this takes, respectfully, a critical eye.  And we did it as fast as we can because I wasn't going to let him go to MDC and then pull him back to try to overcome a bad ruling.

They say that that corroborates the video they found.  Why?  Because it's somebody saying something to somebody else about a 15-year-old boy?  I've seen nothing.  Maybe they have it.  But the record today, nothing about that, that Smith that meets the standard.  We don't know who the other person is.  And we don't have timing.  Where's the metadata on the video?  This says in April 2024.  Okay.  I don't have metadata.  Was that video of the

threesome?

Let's take them at their word, that it's my client and two other males. Was it made in April of 2024? Was it made in January of 2021?

Let's say they found it on his phone. And, again, it's not an invitation, but they're pushing, they're pushing, they're pushing because what they want -- respectfully, what they want the Court to do is to do this, is to say, wait a minute, I hear -- and I know you're not going to, but I hear incendiary allegations, horrible allegations. I'm not even -- look. It makes everybody sick. But that's not what we're here for. This isn't a quote to discuss whether or not that's good or bad, because we all know it's bad.

So that's what they say about the threesome. And I don't think that that's overwhelming evidence of anything. I think it is barely, potentially, maybe preponderance.

Then they say, end of page 2 top of page 3, "Smith bragged about having had sex with at least one additional 15-year-old minor." Okay. So here again we have -- as I understand it, this is "Anon" or some other name. They don't give the name, like the handle or the screen name. But this one's on

something called Session, which, you know, I was not familiar with, but now I understand Session is a messaging app.

They say Smith bragged to another individual about sex with two 15-year-olds, having sex with them once a month or so. Smith -- again, maybe "Anon," maybe some other name -- added that he was both of their firsts and trained them. Well, again, this is talking about something, something bad if it happened, and I still don't know who it was that says it, except for what somebody said and a notification that doesn't meet clear and convincing.

Next one. Smith solicited and obtained production of child pornography from an apparent 15-year-old. Now, for this one, there's no pictures, there's no video. There's nothing. There is Smith asked an apparent 15-year-old on Telegram, who somebody wrote to him and said -- and again, I'm saying "him," the user, okay, but I'm going by what they say, "Smith," that he was at least 15 to send me some vids. The minor recorded a video of him and performing a sexual act. And they say, send it to "Smith." Doesn't say whether they have the video or not. Doesn't really -- and so we can't see what

this person looks like.  But even if they did, it's still linked to this ambiguous account that they say is him based on two things that I don't think are compelling.

Next is Smith planned to meet an apparent 14-year-old minor for sex.  This one basically has the same flaws as the other one.  This one has some more details in here.  There's not a lot of quotes.  I don't know if the quotes would give any ability to question them, but let's assume that the description of the conversation is as they are.  I think that has the same problems.

Then we have this one.  Smith asked an apparent 14-year-old minor to send pictures of his 10-year-old sibling.  Okay.  Let me say it clear.  There's no way this is a 14-year-old on the other end.  Anybody, respectfully, can read it.

So we're supposed to believe that a 14-year-old is asking him, do you have some kids?  They'd be so lucky.  Would you have sex with kids?  And here's the one that I think puts the real question to this.  A 14-year-old says, what's your craziest kink?

Respectfully, Judge, I know that young people might be more sophisticated and more worldly

now than they were when I was a kid. Read this,
Judge. This is not a 14-year-old person. There is
no questioning of that in here. They state it
pretty much as fact, except they have to give up the
"apparent." So I don't think that that is clear and
convincing evidence.

And by the way, Judge, clear and convincing
evidence can't be zero for not compelling. Zero
plus zero plus zero plus somehow equals clear and
convincing evidence. If they have a problem, and
each of them has a problem cumulatively, they have a
problem.

Then we go to page 4, tried to entice an
apparent 12-year-old. Again, more of the same.
This is a conversation. They say sends an image.
Okay. But we have no image. And that image might
be nude, might be child pornography, might not be
child pornography. But what we don't know is that
that image is of this person.

Now, here's why I'm saying that, and it
might sound like I'm making light of somebody
sending child pornography. Let's say this isn't an
apparent 12-year-old. Let's say it's a grown man
sending him child pornography. Bad. A crime. But
here's the problem, that's not what they say it is.

They want this Court to interpret that as my client enticing him to meet for sex. They overplayed their hand with this. And that's why we know that we're really here about this and not about the charges.

And that one, as far as I can tell from the record here today -- and I certainly hope I don't hear a new document or fact dump -- they're allowed to proceed by proffer. Just as a side note, they're allowed to proceed by proffer without giving anybody much of anything. But I would say two things: The proffer should be closely related to the offense. Now here, these offenses are certainly closer than if he was charged with bank robbery and they accused him of sexual assault five years ago.

But here's why they aren't closely linked, because child pornography is extraordinarily different in terms of sentencing, exposure, mandatory minimums, methods of proof, and just in general, the severity attached to it under the law than a contact offense. We're here because of uncharged, untested conduct that the government has put in a way that I just don't think comes across as compelling. So that's the one where they say he tried to entice for that and talking to the person about coming to Miami.

And by the way, this one also talking to someone in Miami, 12 years old. I don't think so. I don't think it sounds like a 12-year-old. I could be wrong, but they have the burden to show that to a high degree of certainty, that this person is 12 years old, and I don't think it shows it.

Then we have the allegations that prompted the government to act expeditiously in their view -- and it was -- in April, and that is -- the headline for this one: Smith planned to meet a father and his purported 7-year-old child for sex.

So, first of all -- and, again, this is how the government overplays its hand. Today the government told you that my client is the one saying, you know, that -- told him, I have a friend I want to meet. I think it was the discussion of the doll. I could be wrong about this because we're trying to go through this, but I don't think he's the one who said some of the things that the government says he said here, right, or that it's even attributed to him.

But this one, it says, "a father." How do we know? How do we know this isn't just somebody talking? This isn't maybe First Amendment-protected speech. I'm not saying that. But what I'm saying

is they're asking you to conclude that there's a
high degree of probability based on this, that it
was a father, that he was bringing a 7-year-old,
that he is the person, my client is the person
behind the text.

And then they have this. And, again, this
is how I'm saying that this is based on a lot of
assumptions that simply don't fly.

Okay. When asked for details, Smith, even
though it's not -- it's some unidentified handle
that we've yet to hear is even linked to him -- when
asked for details, Smith responded "14 minus 7."
And then the government says, "which equals 7." I'm
not making fun of them for acknowledging that 14 - 7
equals 7. What I am saying is it says "14 - 7."
Okay. Is it a dash? Is it a minus?

And, again, I'm nitpicking because they're
asking you to send my client indefinitely to a place
that -- and this is in our brief -- has been
described as inhumane and worse than Colombian
prisons. So, yeah, I do respectfully take issue
with them saying, we, the government, think that
"14 - 7" means a 7-year-old and that the dash is a
minus and not a dash.

You know what I haven't heard? Haven't

heard anything in here that that's code speak in this community. These guys seem to speak pretty freely. I don't know that we need code. I have no idea what that means. I don't have to know what that idea means. They have to know what that idea means. There's nothing in here that says, as agents often do, based on my experience with handling this, this is how this is code. We don't hear anything from this supposed Telegram user, who's really going to be a defendant, that that's how they talk about it.

Then they say, similarly, where Smith -- which we don't know if it's him -- wrote to a third individual, "I may have one when I get home from the Caribbean 21 - 14."

Okay. Again, the difference is 7, but for clear and convincing evidence that that's what they're talking about when all of their other stuff, all their other evidence that they say has an age. So I don't know what that means.

Basically, the same thing for saying he definitely would have sex with a 7-year-old. Again, the headline reads, "Smith." What I'm not hearing is whether -- and by the way, this, Judge, is on Session. And some of the other ones were on

Session, and there was a -- there's another one coming up -- no. Actually, it's Session and Telegram, which they talked about. And there's a third one I can't find right now that I've never heard of.

Oh, Snapchat. I've heard of that. But here's what I don't hear: I don't hear them linking those, even allegedly, to my client the way they say they linked him to the Telegram account. I don't hear anything that the anonymous or the source and future defendant says, oh, I know that Telegram account -- I mean the Snapchat account is him; oh, I know that that Session account is him.

I don't hear anything about, oh, we messaged it and it lit up, et cetera, et cetera. They can blame my client for purportedly deleting everything. Well, okay. Prove it. But don't prove it with him sitting, eating maggot food and not being able to shower in MDC. Prove it.

So then they go off the execution of the search warrant, which apparently what happened here is they had the Target Telephone User's account. They had it, and then the "Anon Anon" stuff disappeared, I guess, before they locked it down or put it in a Faraday bag or whatever they do. Okay.

The stuff disappeared.

Based on that, there's overwhelming evidence of guilt?  I don't know.  I don't know anything about this other person.  I don't know anything about his phone.  I don't know who he dealt with.  We could just as easily stand here and say, well, he got popped.  Maybe he told somebody else and they deleted it because, guess what, uh-oh, my phone is now with the FBI and you are all over it.

Now, that's not like me, defense attorney, making something up because here's what we do know: That person's phone had a ton of CP on it.  They don't say he was the only one -- they don't allege that he's the only one who he traded with.  So we have a guy whose phone is loaded with CP, who is in trouble, who is trying to bring them heads in a relatively quick order, and stuff gets deleted.

So here's also what I didn't hear:  I really didn't hear why none of the conditions that we've proposed wouldn't work.  I haven't.  I get it.  He was home they say when he committed the crime.  Okay.  We let people who commit street crimes out all the time.  They were on the street.  So what.  I just don't think that's a compelling analogy.

He was home.  He could have easily been on

the street doing a drug deal.  If he was committing a murder, he's probably staying in, but doing a million other things, all kinds of different federal crimes.

What about money launderers?  Where are they?  They're at work or at home.  When they get out, where are they?  At work or at home.  By the way, probably on a computer with no computer restrictions because nowadays that's where the money laundering happens.  I don't hear the government saying in any of my money laundering cases, well, he has to be sent to MDC because, when he defrauded investors, he was at a computer, and we don't want him near a computer.  It just doesn't happen.

I get it.  These are incendiary allegations.  They're troubling allegations.  The videos which -- I take them at their word that that's what's in those videos.  But the fact is, saying he's at home is just no way to deal with that part of our bail package.

I don't hear them saying that GPS doesn't work, that he is going to somehow escape.  I don't hear them saying that he's going to somehow -- what is he going to do, get out, get a hotspot, get Verizon to come in and put it in, while, by the way,

his third-party custodian and partner of ten years, no criminal history, U.S. citizen, works, works from home. I don't understand that.

I get it. They want him in MDC. I understand that. But our bail package offered 24-hour house arrest, GPS monitoring. And by the way, to the extent -- and I've seen some courts do this -- that there's costs associated with it, they'll order the defendant to pay. Okay. We'll pay.

24-hour house arrest, GPS monitoring, which, by the way, we have to all assume works because what are we saying, that we're doing something that we're presuming doesn't work, or that there's a high degree of certainty and probability that GPS doesn't work?

No visitors to the home. Again, okay. His third-party custodian lives with him.

And by the way, before I go with the rest, what have they shown that my client won't comply? He knew about this investigation -- and they won't challenge this. He knew about this investigation for months. He gave them the password to his phone to expedite the investigation because -- and I think everyone will agree with this -- iPhones are not

easy to crack.  Would they have cracked it?
Probably.  He gave them the password.

They asked -- at some point, the government
called counsel and said, we would like your
client -- he's uncharged.  We would like him to
refrain from overseas travel because his line of
work, his profession takes him out of the country a
lot.  We hadn't even said he was going.

They called and said, we'd like him to
refrain from out of the country.  We said okay.  We
didn't have any obligation to do that.  They
couldn't have kept him in the United States.  And
the truth is he could have gone to the airport and
been gone before they even knew it.  We said okay.

Then he had some in-U.S. travel plans, and
we notified them of that and got their opinion on
that.  There's nothing to show -- other than the
allegations of him deleting something, there's
nothing to show that he wouldn't comply.

I get it.  But 3142(j) says, even in a bail
setting, he's presumed innocent.  He came here.  He
self-surrendered today.  The government -- and they
didn't have to do this, and I'm saying a lot of
things about them today.  But the government gave
counsel the courtesy and said, listen, he's charged.

You know, we're not going to go pick him up if you guys will bring him here.

We called the client. Guess what? 8 o'clock on the dot, he's here. He didn't try to disappear. He didn't try to get away. He came, by the way, knowing -- even though we didn't have the complaint then, you can assume that his counsel, whatever level of skill we do or don't have, we know what goes on with a 2252A count. He knew what the charges were. He knew how serious it is. He knew one of them has a five-year mandatory minimum. He knew that they were going to -- we didn't have their submission by then, through no fault of the government. He knew what else was going to be in there because we've had good conversations with the AUSA. Instead, he shows up at 8 o'clock this morning.

They have nothing to show that he's going to be some scofflaw who's going to immediately try to get around GPS, a third-party custodian who's here, who fits the bill, house arrest, et cetera, no Internet service.

Yeah, sure, he's so sophisticated that, according to the government, he's filming having sex with minors, leaving it on his phone and then giving

them the password.  Whatever happened, they can't sit here and say that he's Edward Snowden because if they're right about that, he's far from a sophisticated Internet criminal who's going to figure out a way to get some secret Internet service that nobody knows about.

Posting of property.  Money is money.  The Court has to decide whether that's an amount that matters.  I don't think we have access to much more than that.

Surrender of passport.  I think he brought it already and may have turned it in, or obviously we'll do that.

PRETRIAL SERVICES:  Yes, you did.

MR. BALDASSARE:  He did.

Yeah, so we turned in the passport even before the Court ordered it because we knew that whatever happens here today, the passport is coming in, right.  So we brought that.  And then whatever standard conditions there are.

So lastly, I just think that -- and I appreciate the Court's time.  The reason that I have gone through this is because I'm not going to read Your Honor what we submitted about MDC.  And I'm not asking you to send him home because MDC is

disgraceful and disgusting.  But what I am saying is
that the government has a pretty big ask.  And the
fact of the matter is that for all of the incendiary
allegations that nobody wants to read and that
nobody wants to think actually happens, they have a
high burden before Your Honor sends him there.

By the way, it's not like a 30-day
misdemeanor.  We don't know how long he's going to
be there.  If the case goes to trial, is he really
going to sit -- does this man really deserve, based
on the record here today that I've been informed of
so far and that I've had an opportunity to meet,
does he really -- should he really be sitting
someplace where there was just a murder, where
they're on 23-hour lockdown until the case either
goes to trial or is otherwise resolved?

And I say under the legal standard, the
answer is no, and that he should be released on
these conditions, all of which we can meet, you
know, within 24 hours, except maybe the posting of
the bond.  And I've seen -- and I know the Court is
empowered to release him and give him 24, 48 hours
to meet those conditions.  And there's no reason to
think he's going to flee.  In fact, he's
incentivized to get them done.

So that's our request, Judge.  I might want
to respond if I hear a whole host of new things from
the government, although I'm not sure how I could
deal with them like this on the fly, given the
importance of your decision.

THE COURT:  Thank you.

MR. BALDASSARE:  Thank you, Judge.

MR. BERGER:  Thank you.

Mr. Baldassare is right that if this were a
run-of-the-mill case, the argument would be very
different.  He's absolutely correct.  But this isn't
a run-of-the-mill case, and that's for all the
reasons I mentioned earlier.

And I want to respond to a few of defense
counsel's arguments.  I'll take them in turn.

So with regard to the question of whether
Smith really refers to the defendant, the answer is
simple.  They were on his phone.  The FBI seized his
phone from his house, his phone number.  His
subscriber records list him as the subscriber.  And
these were on his phone.  Simple as that.

And with regard to the pop-up notification,
I will proffer the additional piece of evidence.
Let's say -- this is not the actual username.  Let's
say the username was John Doe.  I will say that the

FBI sent a message, and a pop-up notification appeared with new message from John Doe.

And I should add that the complaint has additional evidence linking the defendant to the "Anon Anon" account, like travel records and so on.

Briefly, Mr. Baldassare made the point as to who sent it. I'll point the Court to paragraph 6(d), which indicates that the defendant had sent -- that's the video of the 10-year-old that was sent from the defendant's account. The defendant, the "Anon Anon" account, sent a couple dozen of these videos. That was the first one.

With regard to the "I have a boy 15" message, there's a lot more there. Now, I'm happy to proffer some additional evidence again.

THE COURT: Well, let's get to the heart of it. I think part of the issue is that Mr. Baldassare was saying, maybe these aren't really kids. Maybe they're young-looking grown ups.

MR. BERGER: And he might be right. That's why we used the word "apparent." These are serious allegations. We don't take them lightly.

THE COURT: But if they are young-looking grownups, what does that mean for purposes of my decision today?

MR. BERGER:  The key point is that the defendant thought they were minors.  That's the key point.  That's what makes him a danger.  And, in fact, in a couple of these threads, when he starts doubting that they're minors, he drops off.

It doesn't really matter whether he was chatting with someone who was actually 12.  It matters that he thought he was talking to a 12-year-old.  That's the key point.  That's what makes him dangerous.  And there's plenty of evidence that he thought that they were minors.

And especially with a 15-year-old, there's very specific evidence where that person talks about -- the minor talks about school and school schedules and recess.  And the defendant talks to others where he mentions that he's having sex with a 15-year-old.

And with regard to that specific thread, "I have a boy, 15," the thread continues.  It's a very long message thread, but it includes scheduling discussions, directions.  The third person in the threesome left his watch at the defendant's house, so they made arrangements to pick it back up.  This is not some abstract thing.  This is something that happened.

And I'm happy to respond to specific factual questions that the Court has. But I also want to note that legally -- and this is cited in the first Second Circuit case cited in our submission, the facts that make the defendant dangerous do not have to be connected to the charged conduct. So, for example --

THE COURT: No. I'm with you on that one, actually.

MR. BERGER: Okay. And I want to respond to the home detention argument.

THE COURT: Yeah. I mean, look -- and that's really what this comes down to, right?

MR. BERGER: Yeah. Yeah.

THE COURT: Because the question is -- and I think it's fair to say that the presumption is rebutted by the ties to community, third-party custodian. And it comes back to, have you met your burden of demonstrating by clear and convincing evidence that there is no set of conditions, no set that can be imposed, that can reasonably guarantee the safety of the community, not 100 percent. So that's really what I need to hear from you about.

MR. BERGER: Yeah. Understood.

And on that, here's the key concern:

Nothing is stopping him from getting another phone, starting another anonymous account and doing it all over again. He doesn't need to have a modem, a router, anything like that, that can be monitored. He could get a phone. It doesn't take much sophistication beyond that.

And specifically I want to respond to the third-party custodian. And I take no pleasure in saying this, but the defendant's partner -- actually, in some of these chats, the defendant actually indicates that he was hiding it from his partner, that his partner did not know, was not into this, and that he was hiding it from him. He was scheduling things around his partner's schedule and was doing it behind his partner's back. If his partner worked from home and lived there for ten years, clearly, it didn't work in terms of supervision.

THE COURT: Well, it didn't work when he was hiding it, but now it wouldn't be hidden anymore. And wouldn't that change things?

MR. BERGER: Somewhat. But a phone is not a hard thing to hide. And even if it could change things with regard to having a minor over, fair enough, it doesn't change things with regard to

chatting with minors, sharing or viewing child
pornography.  If there's a will, there's a way.  And
there's clearly a will here, and clearly the means,
and clearly the sophistication to go about this
conduct.

THE COURT:  Is there anything further?

MR. BERGER:  That's it, Your Honor.  Thank
you.

MR. BALDASSARE:  Yeah.  Judge, very
quickly, I keep hearing nothing is stopping him,
nothing is stopping him.

Judge, they want certainty.  You said it
yourself.  Certainty either way is not required.
I'm not required to show it's certain that he'll be
compliant, right.  They have to show clear and
convincing, not certainty.

But here's what I think, respectfully,
might be stopping him.  He has the brief.  He didn't
know what MDC was as of yesterday.  He does now.
Unless he has an unbelievable inability to read and
comprehend, he knows what he's headed for.  And the
Court should assume that he also knows if the Court
lets him out and he screws up, that's where he's
going and we're never coming back and saying, oops.

That, to me, someone with no criminal

history, who's never been, quote/unquote, on the inside, I think that's the biggest deterrent. Maybe being able to eat, shower, not be murdered, have medication that he has to take and not be in 23 lockdown, I think for someone like my client, that's a pretty big deterrent. That's number one.

Number two, Your Honor hit on it. I don't know what these texts say that he's hiding it from his partner. Haven't seen them. Haven't read them. The government can go by proffer, but I'll tell you one thing, if those texts are subject to essentially a close read, an analysis, a cross-examination as these other ones, I'd like to see them if the Court is going to detain my client, our client, at MDC based on that.

I hear a lot of the use of the word "might." The conditional tense isn't clear and convincing evidence. Doesn't have to be "will," but it can't be he might do something. If that's the case, the standard means nothing whatsoever.

How or when or what's reality doesn't matter, I heard -- not in those words -- it's what was in his head that matters. Sure. First of all, again, we're saying it's him. That might matter if we were trying the case, but I don't think it gives

anything near a reasonable or a high degree of
probability what was in his head.

By the way, one thing that I heard was that
things were found on his phone and that that's in
the complaint.  It could be.  But what I see in the
complaint is a description of -- it says, "A
subsequent review of Phone-1 revealed that the user
of the Smith Telegram account" -- which, again, it's
so denominated because this soon-to-be defendant
said it was Smith.

"A review of Phone-1 revealed that the
Smith Telegram account knew Target Telegram User's
first name and that it was him," et cetera,
et cetera, et cetera.  And as I read it, Phone-1 is
related to the person who they seized beforehand.

Even if there are things on a phone that
have "Anon" or things like that, the fact remains
that there is really very little reason to believe
that Mr. Smith is so dangerous that putting him on
lockdown -- and when we crafted this -- and then
I'll wrap up -- we said to ourselves, how can we put
him in MDC, but not let him live like a filthy
animal?  What we came up with is make his apartment
MDC, except let him eat, not be murdered, not have
maggots, shower, not be in lockdown.  This is

essentially MDC.

And by the way, you also know MDC is no great shakes with being not only safe, in our submission, from what I gather, MDC is the easiest place in the world to get drugs. MDC is the easiest place in the world to get a cell phone. I would bet that if we took a close look at the cases from this district, the articles and the statements from BOP people themselves, there's a case that basically says if the defendant is going to intimidate witnesses, he can do it just as easily from MDC as from home. And, in fact, the case says he did just that. He was put in MDC to stop him from intimidating witnesses, and he got a phone and he did it anyway.

So the fact remains, what we're asking is to put him in, basically, MDC, except let him live under humane conditions where he can meet with his counsel, where he can prepare his defense, where he can be safe, locked down, not dangerous. That's wrong, Judge. It is wrong for the government to presume that he's going to go out and violate this. Every single thing that you have says otherwise.

I understand Pretrial's recommendation in this case. As I read Pretrial's recommendation, the

risk of flight is based simply on the child porn offenses that are alleged.

THE COURT: Yeah, I'm not -- like I said, I'm not concerned about the risk of flight.

MR. BALDASSARE: I misspoke. I misspoke. Their assessment on dangerousness, as I read it. That's what I meant.

Their assessment on dangerousness is based on the child porn offenses. But as I read it, it basically would make a per se ban because all they say is the nature of the offenses. There's nothing specific as to our client, like he did it before or anything like that.

As I read this analysis in particular, that could apply -- every single defendant would have to be detained because they don't say anything like, not a citizen, has $50 million in the bank, has dual citizenship.

THE COURT: Well, there are resources here that a lot of other defendants facing similar charges don't have. And those kind of resources can get access to things that you wouldn't want somebody who might be at risk of committing these kinds of offenses to have.

MR. BALDASSARE: Absolutely, Judge, but --

and I don't mean to sound flip -- he had those
resources when he wasn't charged.  He had those
resources when he knew -- when they had come, 20 of
them -- and I'm not saying they overdid it, but a
lot of them came to his apartment.  That's a scary
thing.  He stood totally nude in the hallway while
they executed it, and then they leave.

He had those resources.  He could have fled
then.  He knew in relatively short order what
charges he was facing, without question.  So, yes,
he has resources.  But what I would say is there are
a lot of other people who don't have resources, but
have other types of resources, such as an
out-of-country citizenship, family, someplace to
hide, live in countries with no extradition
treaties.

THE COURT:  But, again, I'm not concerned
about flight.  I'm concerned about commission of
this crime.  And having financial resources enables
one to be in a better position if you were so
inclined to do this.  It's going to be easier to get
a phone than, you know, if you don't have the
resources.  It's going to be easier to buy a new
computer.  Those are the kinds of things that I'm
concerned about.

And I'm concerned that I'll hear from the government that there were purchases of items that could be used to commit these crimes subsequent to the confiscation of the original computers.

MR. BALDASSARE: Well, what I would say, Judge, is, as for resources, respectfully, I don't think -- and I think the government essentially said this. I don't think it takes a lot of resources to get a new smartphone, which is, by the way, where they found the evidence that they say that -- of the threesome.

I think getting a phone is -- pretty much everybody has phones. I don't think getting a new computer requires resources. And as for computers that he bought, you know, before, if he has Internet limitations -- my co-counsel reminds me that's how he works. And, again, that might be viewed as cutting both ways, but he didn't go out -- he's not someone who, say, is a mason, or someone who doesn't need computers to earn money, although there are very few people who don't anymore in some form or fashion.

His job is largely computer based. That's why those new computers were purchased. And, Judge, at the time he did it, he wasn't charged. He was

under suspicion.  He had no obligation to not buy
computers.  And the truth is, if counsel had ever
thought that we should check with them the way we
did -- once we knew they didn't want him out of the
country -- and I know this is risk of flight, but it
goes directly to them saying he's going to ignore
things.

If we had thought, okay, they don't want
him to earn a living, we would have called them.
And if they said no, that's what would have
happened.  And his businesses may have failed
potentially as quickly as they're going to if you
send him to Brooklyn.

So I think that the Court has sufficient
reason to let him be on lockdown at home.  We all
understand he gets one chance at this.  I don't
think it's too big of an ask, given his history and
given the legal standard.

Thank you.

THE COURT:  Thank you.

MR. BERGER:  Just one clarification, just
in case I introduced error.  I'm not aware of any
computer purchases after the search warrant.

THE COURT:  I thought there was a Mini Mac.
Micro Mac.

MR. BERGER:  No.  Well, I don't recall saying that.

In any event, what I'll clarify is this, like, as to the post-search conduct, here's what we know.  We know the FBI was communicating with the "Anon Anon" account through Telegram.  At some point, the FBI executed the search and took the phone, put it in airplane mode.

At some point, when the FBI accessed the account that the FBI was using, they saw that the counterparty with whom they have been communicating -- and instead of saying "Anon Anon," now said -- I don't know -- "Deleted User" or something like that.  That's what we were saying.

We were saying that, after the search, the defendant somehow logged into Telegraph through some other means and deleted it.

THE COURT:  Okay.

MR. BERGER:  And we're not saying he got the device wrongfully or anything like that.  It's just that the deletion is the issue, not with any device.

MR. BALDASSARE:  So, Judge, just in the -- so two things I would say is I still don't hear -- I hear "somehow."  I don't hear anything coming close

to a real allegation that he somehow did it.

But, in candor, my obligation to be candid with the Court, we thought it was in there, but he did get an iPad, a Mini or an iPad or something.

THE COURT:  I didn't think I made it up, but okay.

MR. BALDASSARE:  Yeah.  I just don't want to stand here -- the government, to their credit -- but I don't want you to think that didn't happen because it did, and it was for work.

THE COURT:  Okay.  I am going to take a recess.

(A recess was taken.)

THE COURT:  Please be seated.

So in this case, I find the presumption has been rebutted, as I said, but I find that the government has carried its burden of showing by clear and convincing evidence there are no conditions I can impose that can reasonably assure the safety of the community.

In particular, the nature and the circumstances of the offense charged are very troubling, and I think the weight of the evidence is significant.  While there is no criminal history and there are ties to the community, the behavior that's

charged and not charged has been going on, it's been going on under -- without the knowledge of the person who would be the third-party custodian. And what's been hidden before could easily continue to be hidden. Technology is readily available. Mr. Smith is sophisticated and would understand how to get technology and how to deploy it.

I certainly appreciate the willingness of Mr. Smith's partner to support him, including financially and as a third-party custodian, and I certainly thank you for coming to court today to be part of this process. But due to Mr. Smith's own characteristics, I find that even with that support, I cannot reasonably assure the safety of the community.

I expect you might want to take this.

I believe Judge Failla is the Part 1 judge today. But since it's a felony complaint, would you like a preliminary hearing on the 14th day?

MR. BALDASSARE: No, Judge. I've consulted with the government, asked if we can move it out to 30.

THE COURT: 30 days from today. Monday, July 29th. And I believe that's it.

MR. BALDASSARE: Yes, Judge.

THE COURT:  Is there anything further?

MR. BERGER:  One question, Your Honor, about the written submissions, whether Your Honor would like for us to file them on the docket or not.

THE COURT:  I will say -- well, does defense counsel have a preference?

MR. BALDASSARE:  I'm happy to leave them as is.  I'll take guidance.  If the Court wants them up, we'll put them up, but ...

THE COURT:  I will leave them off for now. I will consult to see whether there is a need for them to be there; otherwise, I think they can remain off the docket.  And I will follow up with that tonight.

Okay.

MR. BERGER:  Nothing further.  Thank you.

THE COURT:  And I believe that that's everything.

MR. BALDASSARE:  Thank you, Judge.


0o0

C E R T I F I C A T E

    I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of United States of America v. Justin Heath Smith; Docket #24MJ2422 was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature  ___*Adrienne M. Mignano*___

          ADRIENNE M. MIGNANO, RPR


Date:     July 2, 2024